**WHITE AND WILLIAMS LLP**
Heidi J. Sorvino, Esq.
Shane R. Heskin, Esq.
James C. Vandermark, Esq.
Andrew E. Arthur, Esq.
7 Times Square, Suite 2900
New York, NY 10036
(212) 244-9500
sorvinoh@whiteandwilliams.com
heskins@whiteandwilliams.com
vandermarkj@whiteandwilliams.com
arthura@whiteandwilliams.com

*Proposed Counsel for Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| JAR 259 FOOD CORP., | Case No. 22-40304 (JMM) |
| Debtor. | |
| JAR 259 FOOD CORP., | |
| Plaintiff, | |
| v. | Adv. Pro. No.: |
| WYNWOOD CAPITAL GROUP, LLC, SAM GROSS, ZALMEN TEITELBAUM AND THE JOHN DOE AND JANE DOE INVESTORS, | |
| Defendants. | |

## <u>COMPLAINT</u>

Jar 259 Food Corp. (the "**Debtor**" or "**Plaintiff**"), the debtor in the above captioned

chapter 11 case, by and through its undersigned counsel, files this complaint (the "**Complaint**")

against Wynwood Capital Group, Inc., (the "**MCA Company**"), Sam Gross (the "**President**"), Zalmen Teitelbaum (the "**Vice President**" and together with the President, collectively, the "**Principal**"), and the John and Jane Doe investors of MCA Company (the "**Investors**" and together with MCA Company and the Principal, collectively, the "**Defendants**" or the "**Enterprise**") and, upon information and belief, alleges as follows:

## NATURE OF THE ACTION

1.      This is an action alleging fraud and civil conspiracy by a merchant cash advance ("**MCA**") company, controlled and manipulated by the Principal and Investors, to carry out a long-running scheme to collect upon unlawful debts and otherwise fraudulently obtain thousands of dollars in funds from the Debtor in violation of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**").  Over the course of the COVID-19 pandemic, the Defendants and the Debtor (collectively, the "**Parties**") entered into certain agreements pursuant to which the Debtor purportedly sold future receipts and became obligated to make daily payments to the MCA Company until a set amount was paid.  While couched as the purchase of future receipts, the terms and conditions of the agreements between the Parties as well as the Defendants' actions demonstrate that no sale of receipts ever took place and the purported form of the transaction was merely a sham to evade applicable usury laws.  In reality, the transactions were loans that charged interest rates that exceeded not less than 100%, rates that are far greater than the maximum 25% permitted under the laws of New York.

2.      Under the Loan Documents (as defined below), the Debtor received less than $180,000.00 from Defendants but was required to pay the Debtor $269,820.00 in daily payments of $4,497.00.  In other words, the Defendants required the Debtor to pay over $89,820 in interest in less than three (3) months, which is a rate of interest far greater than permitted under the laws

of the State of New York.  Therefore, the Plaintiff objects to the MCA Company's claims and seeks a determination that the loans made by the MCA Company are criminally usurious, void, and unenforceable.

3.      The Plaintiff further seeks to avoid and recover from the Defendants, or from any other person or entity for whose benefit the transfers were made, all preferential transfers of property that occurred during the ninety (90) day period prior to the commencement of the bankruptcy case of the Debtor (the "**Preference Period**") pursuant to sections 547 and 550 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

4.      Subject to proof, Plaintiff also seeks to avoid and recover from the MCA Company, or any other person or entity for whose benefit transfers were made, transfers that were fraudulent conveyances pursuant to sections 548 and 550 of the Bankruptcy Code.

5.      In addition, Plaintiff seeks to disallow, pursuant to sections 502(a), (b), (d), and (j) of the Bankruptcy Code, any claim that the MCA Company has filed or asserted against the Debtor or that has been scheduled for the MCA Company.

6.      The Plaintiff requests that the Court use its inherent power to hold the Defendants in contempt for the Defendants' willful violation of the automatic stay under sections 362(a) and 105(a) and seeks damages and the reimbursement of the Debtor's attorney's fees and expenses.

## THE PARTIES

7.      At all times material hereto, Debtor was a limited liability company duly organized under the laws of New York with its principal place of business in Glen Oaks, New York.

8. The MCA Company is a limited liability company duly organized and existing under the laws of the State of Florida with a registered office located at 18117 Biscayne Boulevard, Suite 106, Aventura, Florida, 33160.

9. The President is a principal owner of the MCA Company and an adult resident and citizen of Florida.

10. The Vice President is a principal owner of the MCA Company and an adult resident and citizen Florida.

11. Upon information and belief, each of the Investors is a citizen of New York.

## JURISDICTION

12. The United States Bankruptcy Court for the Eastern District of New York (the "**Court**"), has subject matter jurisdiction over this adversary proceeding, which arises under title 11, arises in, and relates to a case under title 11, pursuant to 28 U.S.C. §§ 157 and 1334.

13. Venue of the Debtor's chapter 11 case and this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14. This adversary proceeding is a core proceeding to be heard and determined by the Court under 28 U.S.C. § 157(b)(2). The Debtor consents to entry of final orders and judgment by the Court.

15. The statutory and legal predicates for the relief sought herein are sections 1961-68 of RICO, sections 105, 362, 502, 544, 547, 548, and 550 of the Bankruptcy Code, and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

**A.     General Background of the Debtor's Business and Financial Troubles**

16.     Since 2015, the Debtor owned a grocery and food retail store, which employed approximately 46 individuals to maintain and operate the store.

17.     Since March 2020, the Debtor's primary supplier, Key Food Stores Co-Operative, Inc. ("**Key Food**") took over the operations of the Debtor's Store, and on February 14, 2022, Key Food advised the Debtor that, as of February 19, 2022, it would no longer operate the Debtor's store.

18.     Since March 2020, the Debtor faced further financial stress and, out of desperation, turned to the MCA Company and other similar lenders to fund its projects and continued operations.

19.     On or about November 29, 2021, the Debtor executed the following:

a.     that certain agreement entitled Merchant Cash Advance Agreement dated November 29, 2021 (the "**Agreement**");

b.     that certain agreement entitled Merchant Cash Advance Agreement Guarantee (the "**Guaranty**");

c.     that certain agreement entitled Merchant Cash Advance Agreement Bank Information (the "**Payment Agreement**");

d.     that certain addendum to the Agreement entitled Addendum to Merchant Cash Advance Agreement for Estimated Payments (the "**Addendum for Estimated Payments**");

e.     that certain addendum to the that certain addendum to the Agreement entitled Addendum to Merchant Cash Advance Agreement for Additional Fees (the "**Addendum for Additional Fees**");

f.     that certain addendum to the that certain addendum to the Agreement entitled Addendum to Merchant Cash Advance Agreement for Additional Security Interests (the "**Addendum for Additional Security Interests**"); and

g.     that certain Declaration of Ordinary Course of Business (the "**Declaration**").

20.    On or about November 29, 2021, the Debtor provided the Agreement, the Guaranty, the Payment Agreement, the Addendum for Estimate Payments, the Addendum for Additional Fees, the Addendum for Additional Security Interests, and the Declaration (collectively, the "**Loan Documents**") to the MCA Company.  True and correct copies of the Loan Documents are attached hereto as **Exhibit A** and incorporated herein as if set forth at length.

21.    All of the Loan Documents are governed by and construed in accordance with the laws of the state of New York.

22.    On November 29, 2021, the Debtor received $168,805.00 by means of a direct transfer of the funds into the Debtor's bank account, which is substantially less than the purported purchase price of $180,000.00 (the "**Loan**") set forth in the Loan Documents.

**B.    General Predatory Background of the MCA Industry**

23.    As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2]  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."[3]

24.    The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.
[2] *Id.*
[3] *Id.*

25.     This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

26.     MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

**C.     The Loan to the Debtor Is Consistent with the MCA Industry's Predatory Practices**

27.     Like many MCA companies the Enterprise preys upon cash-strapped businesses that cannot readily obtain financing from banks and other traditional lenders.  Although its agreement is titled "Merchant Cash Advance Agreement" for the purported sale/purchase of a businesses' future revenue, the Enterprise markets, underwrites and collects upon its transactions as loans, with interest rates far above those permissible under New York law.

28.     When underwriting new transactions, the Enterprise does not evaluate the merchant's receivables, which are the assets purportedly purchased; rather the Enterprise focuses on other factors such as the merchant's credit ratings and bank balances, if they perform any due diligence at all.

29.     Moreover, the MCA Company did not even advance to the Debtor the full amount of the Loan, which was purportedly reduced by the MCA Company for certain fees under the

7

Loan Documents.  The Loan Documents states that certain fees would be assessed by the MCA Company, including:

| Fee | Amount |
|---|---|
| Underwriting and Origination Fees | $17,999.00 |
| UCC Fee | $395.00 |
| Wire Fee | $50.00 |

30.     While the Underwriting Fees, Origination Fees, and ACH Processing Fees related to the costs of due diligence and withdrawing the daily payments, the MCA Company performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fees. Indeed, in reality, these fees were merely additional disguised interest.

**D.     The Loan and Loan Documents are Substantively and Procedurally Unconscionable.**

31.     The Loan Documents are unconscionable contracts of adhesion that are not negotiated at arms-length.

32.     Instead, they contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions, including those involving the Debtor, are really loans.

33.     Among these one-sided terms, the Loan Documents include:  (1) a provision giving the MCA Company the irrevocable right to withdraw money directly from the Debtor's bank accounts, (2) a provision preventing the Debtor from transferring, moving or selling the business or any assets without permission from the MCA Company, (3) a one-sided attorneys' fees provision obligating the Debtor to pay the MCA company's attorneys' fees but not the other way around, (4) a personal guarantee, the revocation of which is an event of default, (5) a jury

trial waiver, (6) a class action waiver, (7) a collateral and security agreement providing a UCC lien over all of the Debtor's assets, (8) a prohibition against the Debtor obtaining financing from other sources without permission from the MCA Company, (9) an assignment of lease of Debtor's premises in favor of the MCA Company, and (10) a power-of-attorney empowering the MCA Company "to take any action or execute any instrument or document to settle all obligations due to [the MCA Company]".

34.     The Loan Documents are also unconscionable because they contain numerous knowingly false statements.   Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the Debtor's receivables, and (3) the fixed daily payment is for the Debtor's convenience.

35.     The Loan Documents are also unconscionable because they are designed to fail. Among other things, the Loan Documents are designed to result in a default in the event that the Debtor's business suffers any downturn in sales by (1) lacking a mandatory reconciliation provision to ensure the amount remitted to the MCA Company reflect the Debtor's actual receipts, (2) preventing the Debtor from obtaining other financing, (3) and requiring the Debtor to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Debtor.

36.     The Loan Documents also contain numerous improper penalties that violate the strong public policy of New York.   Among these improper penalties, the Loan Documents (1) permit the MCA Company to enter a confession of judgment against the Debtor (2) accelerate the entire debt upon an Event of Default, and (3) enforce an assignment of the lease for Debtor's business premises.

**E.**     **The Enterprise Uses a Sham Reconciliation Provision to Disguise the Loans.**

37.     In order to evade state usury laws, the Enterprise includes a sham reconciliation provision in the Loan Documents to give the appearance that the loans do not have a definite term.

38.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

39.     For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the reconciliation provision.

40.     In order to ensure that the Debtor can never use the reconciliation provisions in the Loan Documents, however, the Enterprise falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased.  By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

41.     In fact, the MCA Company had the ability to reconcile the accounts each month based on its access to the Debtor's bank accounts and records, but the MCA Company never reconciled the accounts.

42.     On information and belief, the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

**F.      The Enterprise Intentionally Disguised the True Nature of the Transactions.**

43.      Despite the fact the true nature of the transaction between the MCA Company and the Debtor is a loan, the Loan Documents disclaim that the Debtor was borrowing money from the MCA Company.

44.      The Enterprise's attempt to disclaim the Parties' transactions as a loan is contradicted by the Enterprise's marketing efforts and communications to merchants, which describe the transactions as paying back loans, describe themselves as lending funds to merchants, and consistently describe merchants as borrowing and paying back funds.

45.      Moreover, the transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

> a.      The daily payments required by the Loan Documents were fixed and the so-called reconciliation provision was mere subterfuge to avoid state usury laws. Rather, just like any other loan, the purchased amount was to be repaid within a specified time;
>
> b.      The default and remedy provisions purported to hold the Debtor absolutely liable for repayment of the purchased amount.  The loans sought to obligate the Debtor to ensure sufficient funds were maintained in a designated account to make the daily payments and, after as few as just a few instances of insufficient funds being maintained in the account, the Debtor was in default and, upon default, the outstanding balance of the purchased amount became immediately due and owing;
>
> c.      While the Loan Documents purported to "assign" all of the merchant's future account receivables to the Enterprise until the purchased amount was paid, the merchants retained all the *indicia* and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the purchased amount;
>
> d.      Unlike true receivable purchase transactions, the Loan Documents were underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor.  The Enterprise was not even permitted to contact any account debtor until there was an alleged default under the Loan Documents;

e.     The purchased amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

f.     The amount of the daily payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

g.     The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Debtor's account constituted a default under the agreements;

h.     The Enterprise required the Debtor to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the Debtor's failure to generate and collect receivables.

i.     The Enterprise required that the Debtor grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew or should have known were breached from day one.

46.     But most important is intent:  New York law looks primarily to the intent of the parties in determining whether a transaction is a loan.  Here, usurious intent can be discerned from internal negotiations, practices, and underwriting practices of the Enterprise, which determine the payback based on the number of days in which the Enterprise wants to be paid back.  The number of days for payback has no relation to the timing of the percentage of receivables that the Enterprise was purporting to purchase.

47.     Instead of providing reconciliation, troubled merchants, like the Debtor here, are presented with the opportunity to refinance the loan into a new loan, resulting in the merchant paying interest upon interest—resulting in interest rates into the many hundreds percent range.

48.     On information and belief, the Enterprise systemically offer refinancing to address merchant cash flow in order to reap additional benefit from its high interest loans and avoid any reconciliation.

49.     The Enterprise also shows in their underwriting practices that their agreements are loans.   Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.   When underwriting new transactions, the Enterprise does not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all—yet they still charge hundreds of thousands for their so-called underwriting.

50.     When the Enterprise go to collect upon their agreements, they treat them just like loans.   For example, they require that the merchant make fixed daily payments under their agreements and grant security interests to the Enterprise in substantially all of the merchant's assets to ensure that the daily payments are made.

51.     They also require that the merchants execute confessions of judgment that the Enterprise could file if the merchant fails to make as few as two daily payments under their agreements.   In other words, the Enterprise structure their transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

52.     The Enterprise also engages in other unscrupulous behavior toward their merchants.  Among other things, the Enterprise often fail to advance merchants the full amounts provided for in their agreements, and charge exorbitant fees for services that are never provided and costs that are never incurred.

**G.      Pre-Petition Transfers**

53.      During the Preference Period, the MCA Company received transfers by withdrawing daily amounts from several of the Debtor and non-debtor affiliate bank accounts ("**Preference Transfers**"). The total amount of these Preference Transfers is approximately $112,925.00.

54.      The Debtor made transfers to the MCA Company during the two (2) years prior to the Petition Date (the "**Fraudulent Transfers**", collectively with Preference Transfers, the "**Avoidable Transfers**").  The Fraudulent Transfers were related to loans made by the MCA Company to the Debtor.

55.      The Debtor brings this Complaint against the Defendants to recover the Avoidable Transfers that the MCA Company withdrew from the Debtor's bank account that may be avoided and recovered under the Bankruptcy Code and applicable state law.

**H.      Post-Petition Withdrawals and Transfers**

56.      On the Petition Date, the Debtor filed certain schedules, including Official Bankruptcy Form 206D ("**Schedule D**") and, as set forth on Schedule D, the MCA Company is listed as a creditor holding a secured claim in the amount of $81,952.00 (the "**Scheduled Claim**").

57.      Subsequent to the Petition Date, the Debtor maintained accounts at certain banks, including a business account with Bank of America with an account number ending in 1101 (the "**BOA Account**").

58.       On March 3, 2022, the Debtor learned that the Defendants had withdrawn from the BOA Account approximately $3,500 (the "**BOA Funds**") after the Petition Date, consisting of the following withdrawals:

14

| Date | Withdrawing Party | Status | Amount |
|---|---|---|---|
| 2/23/2022 | Wynwood Capital | Completed | $500.00 |
| 2/24/2022 | Wynwood Capital | Completed | $500.00 |
| 2/25/2022 | Wynwood Capital | Completed | $500.00 |
| 2/28/2022 | Wynwood Capital | Completed | $500.00 |
| 3/01/2022 | Wynwood Capital | Completed | $500.00 |
| 3/02/2022 | Wynwood Capital | Completed | $500.00 |
| 3/03/2022 | Wynwood Capital | Completed | $500.00 |
|  |  | **TOTAL** | **$3,500.00** |

59.    On March 3, 2022, the Debtor sent the Defendants a letter advising that the withdrawal of the BOA Funds after the Petition Date was a violation of the automatic stay provided by section 362(a) of the Bankruptcy Code and seeking the return of the amounts taken from the BOA Account (the "**Stay Violation Notice**").  A true and correct copy of the Stay Violation Notice is attached hereto as **Exhibit B**.

60.    To date, the Defendants have yet to return the BOA Funds to the Debtor which is a continuing violation of the automatic stay under 362(a) of the Bankruptcy Code.

**FIRST CAUSE OF ACTION**
**(Disallowance of All Claims - 11 U.S.C. § 502(a), (b), and (j))**

61.    The Debtor repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

62.    The MCA Company asserts claims against the Debtor for amounts purportedly owed under the Loan Documents (the "**MCA Claims**").

63.    The Loan Documents describe the transaction between the Debtor and the MCA Company as a sale and purchase of receipts and purports to entitle the MCA Company to twenty percent (20%) of the Debtor's daily receipts (the "**Specified Percentage**").

64.     The Loan Documents authorize the MCA Company to make daily withdraws of fixed amounts of $4,497.00 (the "**Fixed Withdraw**") from the Debtor's bank accounts rather than withdrawing the Specified Percentage of receipts.

65.     The Loan Documents do not mandate that the MCA Company reconcile the amount taken out of the Debtor's accounts with the Debtor's actual receipts.

66.     In addition, the MCA Company had access to the Debtor's accounts and knew or should have known the actual receipts the received by the Debtor on a daily basis, but did not adjust the amount it would withdraw from the Debtor's accounts to equal the Specified Percentage.

67.     Under the Loan Documents, the Debtor was required to pay the MCA Company a fixed amount through fixed daily payments and thus, the Loan Documents had a finite term.

68.     The MCA Company is entitled to exercise certain remedies if it does not receive the fixed daily payments set forth in the Loan Documents, including enforcement of claims against the Debtor's affiliates.

69.     The real character of the transaction between the Debtor and the MCA Company is a loan rather than the purchase of the Debtor's receipts.

70.     Under the Loan Documents, the Debtor was to pay over $89,820.00 in interest in less than 2 months, which is a rate of interest in excess of 145% and twice the rate of interest permitted under New York law.

71.     Pursuant to New York Penal Law § 190.42, the interest charged by the MCA Company for the Loan is criminally usurious.

72.      Pursuant to New York General Obligations Law § 5-511(1), the Loan and Loan Documents are void and unenforceable because the MCA Company charged the Debtor a rate of interest that is criminally usurious.

73.      Pursuant to section 502(a), the Debtor may object to the MCA Company's claims in this chapter 11 case.

74.      Pursuant to section 502(b)(1), any and all claims of the MCA Company and/or its assignee, against the Debtor or the Debtor's chapter 11 estate must be disallowed as arising from transactions which are impermissible and void because they violate the laws of the State of New York.

75.      Pursuant to section 502(j), any and all claims of the MCA Company, and/or its assignee, against the Debtor or the Debtor's chapter 11 estate which were previously allowed by the Debtor, included the Scheduled Claim, must be reconsidered and disallowed because the MCA Claims arise from transactions which violate the laws of the State of New York and are void and unenforceable.

76.      Pursuant to sections 502(a), (b), and (j) of the Bankruptcy Code, the Debtor is entitled to a judgment disallowing any claims held or filed by the MCA Company against the Debtor or the Debtor's chapter 11 estate.

<u>SECOND CAUSE OF ACTION</u>
**(RICO:  18 U.S.C. § 1962)**

77.      The Debtor repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

**A.      The Unlawful Activity.**

78.      More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

17

79.     In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

80.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled *An Investigation of the Loan-Shark Racket* brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

81.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

82.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

83.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

84.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

85.     Like here, this was a purely artificial device used by the loan shark to evade the law—an evasion that the Legislature sought to prevent.

86.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Persons.**

87.     The Principal and the Investors are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

88.     At all relevant times, each of the Principal and the Investors was, and is, a person that exists separate and distinct from the Enterprise.

89.     Principal has an ownership interest in the MCA Company and is the mastermind of the Enterprise.

90.     The Investors are individuals and business entities that provide funding for the criminally usurious and unenforceable loans made by the Enterprise.

91.     Through their operation of the MCA Company, the Enterprise solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

**C.     The Enterprise.**

92.     The Principal, the MCA Company, and the Investors constitute an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

93.     The Principal, the MCA Company, and the Investors are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

94.     Beginning since the date of incorporation in 2018 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements

relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

95.    The debt, including such debt evidenced by the Loan Documents, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.  Under New York law, agreements that are usurious are void and unenforceable.

96.    Since at least 2018 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

97.    The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.    The Roles of the RICO Persons in Operating the Enterprise, and the role of the MCA Company within the Enterprise.**

98.    The Principal, the MCA Company, and the Investors have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.    The Principal**

99.    The Principal is an owner and the mastermind of the Enterprise.  He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the

Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of the Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

100.    In the Principal's capacity as the mastermind of the Enterprise, the Principal is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if a borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to the Debtor.

101.    The Principal has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

102.    The Principal has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the MCA Company and to the Investors and the Principal further benefits from the receipt of distributions and payment of salary or commissions by the MCA Company.

### ii. The MCA Company

103. The MCA Company is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of the Principal and the Investors.

104. The Principal and the Investors have operated the MCA Company as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, the MCA Company has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

### iii. The John and Jane Doe Investors

105. The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of the MCA Company and the Principal.

106. Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing the MCA Company with all or a portion of the pooled funds necessary to knowingly fund the usurious loans, including the Loan Documents, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

107.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### E.    Interstate Commerce

108.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

109.    Specifically, members of the Enterprise use personnel in their office to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

### F.    Injury and Causation.

110.    The Debtor has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

111.    The injuries to the Debtor directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to improperly collected criminally usurious loan payments.

112.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

113.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

### THIRD CAUSE OF ACTION
#### (Conspiracy under 18 U.S.C. § 1962(d))

114.    The Debtor repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

115.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

116.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Loan Documents, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

117.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Loan Documents, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Loan and Loan Documents.

118.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

119.    The participation and agreement of each of the Defendants was necessary to allow the commission of this scheme.

120.     The Debtor has been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

121.     The injuries to the Debtor directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected loan payments.

122.     The Debtor has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

123.     Pursuant to 18 U.S.C. § 1964(c), the Debtor is entitled to treble damages, plus costs and attorneys' fees from the Defendants**.**

**FOURTH CAUSE OF ACTION**
**(Avoidance of Preference Period Transfers - 11 U.S.C. § 547)**

124.     The Debtor repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

125.     During the Preference Period, the Defendants received the Preference Transfers from the Debtor that were to or for the benefit of the MCA Company in an aggregate amount not less than the amount set forth on **Exhibit C** hereto.

126.     Each Preference Transfer constituted transfers of an interest in the Debtor's property to or for the benefit of the MCA Company.

127.     The MCA Company was a creditor of the Debtor at the time it received each of the Preference Transfers by virtue of the Loan Documents and the Debtor's purported obligation to pay claims arising thereunder.

128.    Each Preference Transfer was to or for the benefit of a creditor within the meaning of section 547(b)(1) of the Bankruptcy Code because each Preference Transfer either reduced or fully satisfied a debt or debts then owed by the Debtor to the MCA Company.

129.    Each Preference Transfer was made for, or on account of, an antecedent debt or debts owed by the Debtor to the MCA Company before such Preference Transfers were made, as asserted by the MCA Company and memorialized in the Loan Documents, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of the MCA Company.

130.    Each Preference Transfer was made while the Debtor was insolvent.  The Debtor is entitled to the presumption of the Debtor's insolvency for each Preference Transfer made during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

131.    As a result of each Preference Transfer, the Defendants received more than the Defendants would have received if: (i) the Debtor's bankruptcy case was a case under chapter 7 of the Bankruptcy Code; (ii) the Preference Transfers had not been made; and (iii) the Defendants received payments of their debts under the provisions of the Bankruptcy Code.  As evidenced by the Debtor's schedules filed in the underlying bankruptcy case as well as the proofs of claims that have been received to date, the Debtor's liabilities exceed its assets such that the Debtor's unsecured creditors will not receive payment of their claims in full from the Debtor's bankruptcy estate.

132.    In accordance with the foregoing, each Preference Transfer is avoidable pursuant to 547(b) of the Bankruptcy Code.

## FIFTH CAUSE OF ACTION
### (Avoidance of Constructive Fraudulent Conveyances - 11 U.S.C. § 548)

133.    The Debtor repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

134.    During the two years prior to the Petition Date, the MCA Company received the Fraudulent Transfers from the Debtor that were to or for the benefit of the MCA Company.

135.    The Debtor did not receive reasonably equivalent value in exchange for the Fraudulent Transfers, and

      a.    the Debtor was insolvent as of the date of the Fraudulent Transfer(s), or became insolvent as a result of the Fraudulent Transfer(s); or

      b.    the Debtor was engaged, or about to engage, in business or a transaction for which any property remaining with the Debtor or for whose benefit the Fraudulent Transfer(s) was made was unreasonably small capital; or

      c.    the Debtor intended to incur, or believed it would incur, debts beyond its ability to pay upon maturity.

136.    Each of the Fraudulent Transfers constituted a transfer of an interest of the Debtor in property.

137.    At the time of each Fraudulent Transfer, the MCA Company knew or should have known that the Debtor was insolvent and incapable of entering into the Loan Documents.  Thus, the MCA Company received each of the Fraudulent Transfers without good faith and with the knowledge of their avoidability.   Accordingly, the MCA Company is not entitled to a replacement lien pursuant to section 548(c) of the Bankruptcy Code.

138.    Pursuant to sections 548(a)(1)(B) of the Bankruptcy Code, the Debtor is entitled to a judgment: (a) avoiding the Fraudulent Transfers, (b) directing the Transfers be set aside, (c)

27

requiring the MCA Company, as the recipient of the Fraudulent Transfers, to take such steps as necessary to set aside the Fraudulent Transfers, and (d) denying the MCA Company a replacement lien pursuant to section 548(c) of the Bankruptcy Code.

**SIXTH CAUSE OF ACTION**
**(Avoidance of Fraudulent Conveyances - New York Law, DCL §§ 273-275, 278, and 279)**

139.    The Debtor repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

140.    Each of the Avoidable Transfers constituted a transfer of an interest of the Debtor in property.

141.    At all relevant times there have been one or more creditors who have held and still hold matured or un-matured unsecured claims against the Debtor that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

142.    The Debtor did not receive fair consideration for the Avoidable Transfers.

143.    The Debtor was insolvent at the time the MCA Company caused the Avoidable Transfers to occur, or, in the alternative, the Debtor became insolvent as a result of the Avoidable Transfers.

144.    At the time of the Avoidable Transfers, the MCA Company was aware or should have been aware that the Debtor was insolvent and the Loan Documents were legally impermissible.  Thus, the MCA Company received the Avoidable Transfers without good faith and with the knowledge of their avoidability.

145.    Pursuant to sections 273-275, 278, and 279 of the New York Debtor & Creditor Laws (the "**DCL**"), and section 544 and 550 of the Bankruptcy Code, the Debtor is entitled to a judgment: (a) avoiding the Avoidable Transfers, (b) directing that the Avoidable Transfers be set

28

aside, and (c) requiring the MCA Company, as the recipient of the Avoidable Transfers, to take such steps as necessary to set aside the Avoidable Transfers.

## SEVENTH CAUSE OF ACTION
### (Recovery of Avoided Transfers – 11 U.S.C. § 550)

146.     The Debtor repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

147.     The Debtor is entitled to avoid the Avoidable Transfers pursuant to 11 U.S.C. §§ 544, 547(b) and 548.

148.     The Defendants were the initial transferees of the Avoidable Transfers or the immediate or mediate transferees of such initial transferees or the persons for whose benefit the Avoidable Transfers were made.

149.     Pursuant to section 550(a) of the Bankruptcy Code, the Debtor is entitled to recover from the Defendants the Avoidable Transfers, plus interest thereon to the date of payment and the costs of this action.

## EIGHTH CAUSE OF ACTION
### (Disallowance of all Claims – 11 U.S.C. § 502(d))

150.     The Plaintiff repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

151.     The MCA Company is a transferee of Avoidable Transfers under sections 547 and 548 of the Bankruptcy Code, which are recoverable by the Plaintiff under section 550 of the Bankruptcy Code.

152.     The MCA Company has not paid to the Plaintiff the amount of the Avoidable Transfers, or turned over such property, for which the MCA Company is liable under section 550 of the Bankruptcy Code.

153.    Pursuant to section 502(d) of the Bankruptcy Code, the MCA Company's claims as asserted against the Debtor or the Debtor's chapter 11 estate must be disallowed until such time as the MCA Company pays to the Debtor an amount equal to the aggregate amount of the Avoidable Transfers, plus interest and costs.

## NINTH CAUSE OF ACTION
### (Contempt for Violations of the Automatic Stay – 11 U.S.C. §§ 105 and 362(a))

154.    The Debtor hereby incorporates all previous allegations set forth above in this Complaint as though fully set forth herein.

155.    Upon the Petition Date, section 362(a)(3) of the Bankruptcy Code operated as a stay against any action to obtain possession of property of the Debtor's estate or to exercise control over property of the Debtor's estate.

156.    Upon the Petition Date, section 362(a)(6) of the Bankruptcy Code operated as a stay against any action to collect, assess or recover a claim against the Debtor that arose before the Petition Date.

157.    By assessing and withdrawing the post-petition BOA Funds from the Debtor's BOA Account, the Defendants knowingly and willfully violated sections 362(a)(3) and 362(a)(6) of the Bankruptcy Code.

158.    The post-petition BOA Funds withdrawn from the Debtor's BOA Account are void, or voidable by the Court, as violations of the automatic stay imposed by sections 362(a)(3) and 362(a)(6) of the Bankruptcy Code.

159.    Pursuant to sections 105(a) and 362(a) of the Bankruptcy Code, the Court may use its inherent contempt power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," in this instance 11 U.S.C. § 362(a), to

sanction the Defendants and awarding Plaintiff damages, pre- and post-judgment interest, costs, and attorneys' fees and expenses.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff demands judgment in its favor and against Defendants, jointly and severally, and seeks an Order:

a)    On Count One, a judgment finding the transaction between the Debtor and the MCA Company to be an unlawful usurious loan under New York Penal Law §190.40, which is void and unenforceable, and disallowing all claims held by the MCA Company pursuant to 11 U.S.C. §§ 502(a), (b), and (j).

b)    On Count Two, a judgment against the Principal and Investors declaring the Loan between the Debtor and the Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable; awarding the Debtor compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at a hearing, treble damages as well as attorneys' fees and costs;

c)    On Count Three, a judgment against all of the Defendants declaring the Loan between the Debtor and the Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable; awarding the Debtor compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at a hearing; awarding the Debtor treble damages as well as attorneys' fees and costs**;**

d)    On Count Four, a judgment against all of the Defendants pursuant to 11 U.S.C. § 547 avoiding the Preference Transfers, directing the Preference Transfers be set aside, and requiring the Defendants, as recipients of the Preference Transfers, to take such steps as necessary to set aside the Preference Transfers;

e)    On Count Five, a judgment against all of the Defendants pursuant to 11 U.S.C. § 548 avoiding the Fraudulent Transfers, directing the Fraudulent Transfers be set aside, requiring the Defendants, as the recipients of the Fraudulent Transfers, to take such steps as necessary to set aside the Fraudulent Transfers, and denying the Defendants a replacement lien pursuant to section 548(c) of the Bankruptcy Code;

31

f)        On Count Six, a judgment pursuant to New York Law, DCL §§ 276, 276-a, 278, 279 and 11 U.S.C. § 544 to return to the Debtor the amount of the Avoidable Transfers, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees

g)        On Count Seven, a judgment pursuant to 11 U.S.C. § 550 directing the Defendants to return to the Debtor the amount of the Avoidable Transfers, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees;

h)        On Count Eight, a judgment pursuant to 11 U.S.C. § 502 disallowing any claims held or filed by the Defendants against the Debtor or the Debtor's chapter 11 estate until the Defendants return the Avoidable Transfers to the Debtor;

i)        On Count Nine, a judgment under Section 362(a) of the Bankruptcy Code finding the MCA Company in contempt by withdrawing the BOA Funds from the Debtor's BOA Account and awarding Plaintiff damages, pre- and post-judgment interest, costs, and attorneys' fees and expenses; and

j)        Such other and further relief as this Court may deem just and proper.

Dated:   April 14, 2022                      WHITE AND WILLIAMS LLP

                                      */s/ Andrew E. Arthur*
                                      Heidi J. Sorvino
                                      Shane R. Heskin
                                      James C. Vandermark
                                      Andrew E. Arthur
                                      7 Times Sq., Suite 2900
                                      New York, NY 100036
                                      sorvinoh@whiteandwilliams.com
                                      heskins@whiteandwilliams.com
                                      vandermarkj@whiteandwilliams.com
                                      arthura@whiteandwilliams.com

                                      *Proposed Counsel to Debtor and Debtor-in-Possession*