**LaMONICA HERBST & MANISCALCO, LLP**          Relates to a Hearing: September 28, 2022 at 10:00 a.m.
*Counsel to creditor The LCF Group Inc.*
*a/k/a Last Chance Funding Group, Inc.*
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500
Joseph S. Maniscalco, Esq.
Melanie A. FitzGerald, Esq.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
In re:                                                Chapter 11

      JAR 259 FOOD CORP.,                     Case No. 22-40304 (JMM)

          Debtor.
---------------------------------------------------------------X

**SUPPLEMENTAL STATEMENT IN SUPPORT OF OBJECTIONS TO APPLICATION
OF WHITE & WILLIAMS LLP FOR THE ENTRY OF AN ORDER AUTHORIZING
ITS RETENTION AS COUNSEL TO THE DEBTOR
*NUNC PRO TUNC* TO PETITION DATE**

TO:    THE HONORABLE JIL MAZER-MARINO
       UNITED STATES BANKRUPTCY COURT JUDGE

        The LCF Group, Inc. a/k/a Last Chance Funding Group, Inc. ("Last Chance Funding"), a

party-in-interest of the bankruptcy estate of Jar 259 Food Corp. ("Debtor"), by its counsel,

LaMonica Herbst & Maniscalco, LLP ("LHM"), submits this Supplemental statement in further

support of the several objections to the application of White & Williams LLP ("Application")[1]

[Dkt. No. 27], which has been adjourned numerous times and is currently scheduled for a hearing

on September 28, 2022, seeking the entry of an Order authorizing its retention as counsel to the

Debtor *nunc pro tunc* to the Petition Date, respectfully sets forth and represents as follows:

---

[1]     White & Williams LLP continues to adjourn the retention hearing and has been proposed counsel for an
     unprecedented six (6) months.

## THE BANKRUPTCY FILING[2]

1.        On February 18, 2022 ("Petition Date"), the Debtor filed a voluntary petition ("Petition") for reorganization under Chapter 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York ("Court").

2.        From the outset, the Petition was identified as a deficient filing.  See Dkt. No. 7. As of the date hereof, all creditors and the Court are aware of several amendments after the Debtor got caught. As set forth herein, the amendments are still wrong.

3.        As of the date hereof, the following objections have been filed to the retention of White & Williams LLP ("White and Williams"), primarily because White and Williams has not, from inception, provided full and transparent disclosure to the Court, Office of the United State Trustee and creditors in this case:

(a)      Key Food Stores Co-operative, Inc.[3] [Dkt. Nos. 26, 51 & 100];

(b)      Last Chance Funding [Dkt. No. 83];

(c)      Panthers Capital, LLC, Mr. Advance, LLC, Lifetime Funding, LLC, Wynwood Capital Group, LLC, Fox Capital Group, Inc., Legacy Capital 26, LLC, True Business Funding, LLC, Fusion Funding, LLC and Kingdom Kapital [Dkt. No. 84];

(d)      Cobalt Funding Solutions [Dkt. No. 97];

(e)      Limited Objection and Reservation of Rights with Respect to Application of White and Williams LLP for Entry of an Order Authorizing its Retention as Counsel to the Trustee [Dkt. No. 99];

(f)      Statement in Support of Objections to Application Of White & Williams LLP for The Entry of An Order Authorizing Its Retention as Counsel to The Debtor *Nunc Pro Tunc* to Petition Date [Dkt. No. 103]; and

(g)      Statement of the Office of the United States Trustee objecting to the retention [Dkt. No. 169].

---

[2]        The Court is fully familiar with the facts of this case and the numerous objections that have been filed.
[3]        Key Food has been very vocal from inception about the retention of White and Williams.

4.      The objections are extensive, detailed and cannot be reconciled in favor of retention. The Key Food objection is thought out, pointed and should be sustained. The issues raised in the objections cannot be resolved just because the Debtor has a proposed settlement with Key Food; either the Debtor has a conflict or it does not.  The issues raised in the objections cannot be resolved in any way as they are irreconcilable conflicts of interest. The objection of the U.S. Trustee is also clear, concise and well-reasoned. To make matters worse, the creditors recently learned that White & Williams was paid from money the Debtor defrauded the Small Business Administration ("SBA") and is now a potential target of a clawback claim for at least $150,000. White & Williams has known this fact for quite some time.

5.      As of the date hereof, White & Williams has also failed to disclose the current alleged outstanding fees and expenses it has incurred in this case on behalf of the Debtor, on behalf of the Affiliates, and on behalf of the Principals.  The initial plan and amended liquidating plan are both silent as to the current administrative fees incurred to date.[4]

6.      The reason for this supplemental statement is production made by White and Williams and the Affiliates in connection with the examination of the Debtor's Principal.  Indeed, this Court is fully familiar of the arduous task of creditors to obtain full and fair disclosure in connection with the Bankruptcy process and retention of counsel. At each turn, when disclosure is sought, Debtor's proposed counsel objects, provides pieces of information, or simply ignores the request. The mishandling of the schedules alleged scrivener's errors and amendments cannot be overlooked.

7.      The Debtor elected to file this case under Subchapter V of Chapter 11 of the Bankruptcy Code, the Small Business Reorganization Act.  This election is suspicious, at best, as

---

[4]      White and Williams has repeatedly demanded at least five (5) lawyers being involved in this liquidating case.

this Debtor was apparently not operating and effectively filed the case on a Friday evening and was closed the next morning.[5] Interestingly, however, three (3) months before the Filing Date, the Debtor had over $8,000,000 (MM) pass through its various bank accounts and that of its Affiliates. Yet, on the Filing Date, it was essentially out of money.[6]

8.      Yann Geron was appointed as the Subchapter V Trustee for this Debtor ("Subchapter V Trustee").

9.      In the Petition, the Debtor schedules a myriad of co-debtors ("Affiliates").[7]  It is unclear the nature of the exact relationship between the Debtor and the Affiliates. The Court has learned that most Affiliates are not even operating, yet the Debtor has transferred millions to those entities. How White & Williams believes it is appropriate for the Debtor to transfer millions to non-operating Affiliates is puzzling.

**A.      The Timing of the Debtor's Relationship with White and Williams**

10.      According to the sworn schedules, on September 27, 2021, the Debtor met with White and Williams.  A copy of the initial schedules signed under penalty of perjury by the Principal and counsel on February 16, 2022 is annexed hereto as **Exhibit A**.

11.      Recently, after a review of the purported stipulation with Key Food, LCF was directed to the proof of claim of Key Food. In that document, apparently, Key Food obtained a judgment against the Debtor on September 21, 2021, **one week before** White and Williams met with the Debtor according to the original sworn schedules. A copy of the Judgment is annexed hereto as **Exhibit B**.

---

[5]      There is a pending motion filed by Cobalt dealing with these issues.
[6]      While the Debtor and its counsel represent it all was shuffled around to 37 different MCA's, it has never provided proof of this statement.
[7]      It is unclear whether the Debtor should also be filing financial reports under Bankruptcy Rule 2015.3.

12.     Starting in October 2021 and continuing to the end of December 2021, the Debtor appears to have embarked on a concerted effort to obtain millions of dollars from MCA companies as well as the SBA.[8]

13.     On January 13, 2022, White and Williams allegedly sent a retainer agreement to the Badshah Farmers Market.  That agreement provided for a retainer of $75,000 and a filing in the "Northern District of Illinois". According to Amandeep Singh, one of the Principals of the Debtor, he changed the scope of services to "MCA debt restructure settlement" at the top of the document and wired $20,000 to start the process. A copy of the January 13, 2022 retainer agreement is annexed hereto as **Exhibit C**.

14.     On January 25, 2022, White and Williams allegedly sent a second retainer agreement to represent ten (10) different entities and people: Jar 259 Food Corp, Inc., OM Vegetable Corp., Inc., A&S Vegetables, Inc., Ameet Properties, LLC, 3350 Kaur Farms, Inc., Kaur Farms, Inc., VLS Farms, Inc., OM Liquors, Inc., Kuljit Kaur and Amandeep Singh (collectively, the "Entities"). The following companies were not ever operating entities -- OM Liquors, Inc., VLS Farms, Inc., A&S Vegetables, Inc. and Ameet Properties, LLC. A copy of the second retainer agreement is annexed hereto as **Exhibit D**.  This retainer agreement provided for a bankruptcy filing of the Entities and a retainer of $200,000. As of today, White and Williams has not filed anything with the Court that it does not represent the Entities in the bankruptcy case.[9]

15.     On January 26, 2022, Pritam Kaur, Mr. Singh's mother, provided a Cashier's Check to White and Williams in the amount of $150,000.  A copy of the check is annexed hereto as

---

[8]     Upon information and belief, the Debtor also received a PPP Loan of $300,000 earlier in the year.
[9]     Apparently, White & Williams agreed to terminate its relationship post-petition of the Affiliates only in certain "state court actions".

**Exhibit E**. This money has been directly traced to money that came from the SBA to Pritam Kaur's Chase bank account and then to White and Williams.

16.    Despite repeated requests, White and Williams has not provided the additional $50,000 proof of payment or where the money came from to complete the second retainer agreement, but represented that it did in fact receive the additional $50,000.[10]  In total, it appears that White and Williams received $220,000, not the $200,000 it has disclosed in all its filings.

17.    The decision to only file JAR 259 Food Corp. is suspicious despite the second retainer agreement to the contrary.    That decision and the attorney client privileged communications surrounding that decision must be explored. For instance, did Debtor's counsel realize at that time that the Debtor embarked on this massive fraud of obtaining millions of dollars from MCA companies and the SBA, and then elected not to file all Entities into bankruptcy due to the disclosure of that information?  These and other inquiries must be explored and explained.

**B.    The Debtor's Amended Statement of Financial Affairs**

18.    On August 18, 2022, the Debtor amended its statement of financial affairs [Dkt. No. 136]. Finally, almost six (6) months later, White & Williams amended Q11.1 and indicated it was paid $200,000 from 3350 Kaur Farms, Inc. and OM Vegetables, the only operating affiliated entities. However, this information is still incorrect as Exhibit E shows White & Williams was paid by Pritam Kaur not 3350 Kaur Farms, Inc. and OM Vegetable. Perhaps, White & Williams also received another $200,000 from those companies as well as the money from Pritam Kaur, but who knows? As of today, Q11.1 of the SOFA [Dkt. No. 136] is still wrong. A copy of the current Q11.1 of the SOFA is annexed hereto as **Exhibit F**.

---

[10]    Requests for this information were made on July 19, 2022, July 26, 2022, August 29, 2022 and September 8, 2022.

19.      Based on the filings before this Court, it is clear the Debtor has been used as a mere conduit to transfer money to the Affiliates and then to the Principals.  On numerous occasions, the Debtor received money from MCA companies and then the SBA and immediately withdrew that money from its bank accounts and wired it to its Affiliates, who are also represented by the same counsel, or the parents of Mr. Singh. As such, White and Williams represented the transferor and the transferee of the conveyances of money that was made by the Debtor as a conduit to the Affiliates.[11]

## C.      The Debtor's Disappearance of the SBA's Money and Lack of Disclosure

20.      As the Court is aware, even more troubling, the SBA advanced the Debtor $2,000,000 (MM) within 60 days of the bankruptcy case. It is undisputed that it transferred $500,000 of that money to a nonoperating Affiliate (VLS Farms, Inc.), again represented at the time by White and Williams, and then $1,500,000 (MM) to Mr. Singh's parents. That money appears to be safeguarded from creditors' claims, yet the Debtor is liable on the debt to the SBA. To make matters worse, the Debtor never listed the SBA on its initial filings with the Court and counsel never mentioned the SBA in any of the four (4) status conferences before the Court. This alone is shocking and grounds for disqualification. White and Williams had to know the SBA existed prior to July 20, 2022 when it finally disclosed them as a creditor.

21.      Coincidentally, based on the Debtor's sworn filing, it appears the Debtor engaged in a plan after it may have consulted with White and Williams in September 2021 to enter into over 37 MCA agreements and obtain millions of dollars, which it received and transferred to nonoperating Affiliates and the Principals' parents.  There may not be a better set of facts for the quick recovery of a fraudulent conveyance. Yet, White and Williams has yet to demand the

---

[11]      If White and Williams was the recipient of these transfers, which derived from the MCA companies and the SBA, then a claim under Section 550 exists to recover all of that money back to the Debtor's estate.

recovery of that money as proposed counsel to the estate. Now, they want the Court to consider a liquidating plan, abandon the claims to a plan administrator who they pick under a one-sided trust agreement to obtain as much time as possible for the transfers to be safeguarded, and somehow obtain a release and cleanse everything that previously occurred. This is disingenuous, at best.[12]

22.    With the litigation strategy of a good defense is an aggressive offense, White and Williams sued only certain MCA's who voiced concern with the Court, without evidence, complaining about an entire industry, and then attempted through a plan to obtain third party releases for itself, the Affiliates and the Principals.[13]

23.    Not only should White and Williams not be retained, but the Court should direct an in-depth detailed investigation into all money received by White and Williams from any and all sources connected to the Debtor, directly or indirectly, the timing of all meetings, and the consultation of strategy that was implemented.

24.    White and Williams cannot wear two hats, let alone almost ten different hats.  In this case, it wears many different hats and has no independent duty of loyalty to the Debtor.  This is very troubling as there is no way to decipher the loyalty Debtor's counsel owes and how far the attorney client privilege extends.  Debtor's counsel is required to only represent the interests of the Debtor and not the principal or the Affiliates, yet it appears to have already been paid by or on behalf of the Affiliates and principal. Its current duty is in an irreconcilable conflict. For instance, if claims exist against the principals and/or the Affiliates, which they clearly do, Debtor's counsel should have disclosed those claims on the Petition and already pursued them.

---

[12]    White & Williams has made as a condition to any plan administrator that they are the retained counsel.
[13]    The only pending adversaries are against LCF, Panthers Capital, Wynwood and Kingdom Kapital, who are the only ones who sought disclosure in this case.

**D.      The Debtor's Plan and Amendments**

25.     On May 19, 2022, the Debtor filed a liquidating plan. In that plan, the Debtor and counsel swore to the veracity of the information at that time. Indeed, the SBA is not listed as a creditor. Therefore, on the day the liquidated plan was filed it was false.  On that day, White & Williams and the Debtor swore to the Court and creditors that its plan should be confirmed but once again failed to fully disclose its creditor body.

26.     On July 19, 2022, Amandeep Singh testified in connection with the conversion of the case.

27.     On July 20, 2022, the Debtor filed an amended list of creditors and included the SBA's address [Dkt. No. 22].  This was a one-page document merely listing the SBA address.

28.     One month later, on August 16, 2022, the Debtor filed its amended schedules now listing the SBA and its $2MM obligation. See [Dkt. No. 120].

29.     The Debtor has since amended its plan and has provided some more information, but as the Court mentioned at the last hearing, the two years transfers are still not included.

**E.      White & Williams Has Not Been Serving the Pleadings on Creditors**

30.     Interestingly, it was just learned that after a review of the Court's docket, it appears the Debtor did not file any affidavit of service for its amended schedules.  Therefore, one must ask whether many creditors even know what is happening in this case.

31.     A further review of the Court's docket reveals the Debtor routinely did not file any affidavits of service for motions it filed. For instance, this firm was never served with the 9019 Motion with Key Food until asked for it during a call. There is no affidavit of service of the Key Food 9019 motion on the docket and none of the creditors were served. White & Williams indicates in its 9019 Motion that it is not required to serve all creditors by mail.

9

## WHITE AND WILLIAMS HAS A CONFLICT

32.    When assessing conflicts of interest, the rules regarding representation of current and former clients are clear. Generally, unless all affected clients and other necessary persons consent to the representation, a lawyer may not represent a client if the representation would involve a conflict of interest. A conflict of interest is involved if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person. Additionally, unless all affected clients consent to the representation a lawyer in civil litigation may not represent one client to assert or defend a claim against or brought by another client currently represented by the lawyer, even if the matters are not related. In re MF Glob. Inc., 464 B.R. 594, 596 (Bankr. S.D.N.Y. 2011).

33.    Disciplinary Rule 5-108 provides that "[a] lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure … [t]hereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client …" N.Y. Code of Prof. Resp. DR 5-108. The Second Circuit has held that an attorney may be disqualified under Disciplinary Rule 5-108 if:

> (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client. Jones v. Winters Bros. Waste Sys., No. 07-CV-0772 (JFB) (AKT), 2007 U.S. Dist. LEXIS 69460, at *8 (E.D.N.Y. Sep. 19, 2007).

34.    In contrast, concurrently representing adverse parties is prima facie improper. Importantly, a court will consider an attorney who represents two clients with adverse interests in the same matter, albeit in different courts, to be concurrently representing those clients. To rebut a prima facie disqualification case, it is incumbent upon the attorney to show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation. In other words, the Second Circuit's per se rule against concurrent adverse representations shifts the burden to the attorney opposing disqualification. And this is a burden so heavy that it will rarely be met. <u>Akagi v. Turin Hous. Dev. Fund Co.</u>, 2017 U.S. Dist. LEXIS 41321, at \*1 (S.D.N.Y. Mar. 22, 2017).

35.    New York Rules of Professional Conduct, Rule 1.7, Conflict of Interest: Current Clients subsection (a) states:

> Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer would conclude that either: (1) the representation will involve the lawyer in representing differing interests; or (2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation **does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation** or other proceeding before a tribunal; **and** (4) each affected client gives informed consent, confirmed in writing.

36.    "Under the New York rules of professional conduct, a lawyer generally cannot simultaneously serve clients with conflicting interests." <u>Kittay v. Kornstein</u>, 230 F.3d at 537. Disciplinary Rule 5-105 (a) and (b) forbid an attorney "from commencing or continuing

simultaneous representation of two or more clients if his exercise of independent professional

judgment on behalf of either would likely be 'adversely affected,' or where the dual representation

would likely involve the representation of 'differing interests.'" In re Granite Partners, L.P., 219

B.R. 22, 34 (Bankr. S.D.N.Y. 1998); N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.24(2005).

"Differing interests include every interest that will adversely affect either the judgment or the

loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest."

22 NYCRR § 1200.1.

37.      "The Second Circuit has long recognized that it is 'prima facie improper' for an

attorney to represent one existing client in a matter adverse to another existing client." Pergament

v. Ladak, 2013 U.S. LEXIS 102824, *9 (E.D.N.Y. 2013); see also Hempstead Video, Inc. v. Vill.

Of Valley Stream, 409 F.3d 127, 133 (2d Cir. 2005).

38.      A conflict due to concurrent representation can occur where an attorney represents

clients in two separate actions, even though the simultaneous representations have nothing in

common. Pergament v. Ladak, 2013 U.S. LEXIS 102824, *19 (E.D.N.Y. 2013).  If there is a risk

that confidences from one client may be used against that client, disqualification is virtually

automatic. Id.  In this case, there is ample evidence to support that the Pergament firm's recent

strategy of placing liability on another one of its client's to defend the other client is prima facie

improper.  See Hempstead Video, Inc. v. Vill. Of Valley Stream, 409 F.3d 127, 133 (2d Cir. 2005).

He seems to get away with this approach, but the time has come where justice, integrity in the

process and professionalism should prevail.  As a consequence, the Court should overrule the

Opposition and enter Judgment in favor of the trustee

39.      "To be retained under section 327(a), professionals must be both disinterested and

not hold or represent any interest adverse to the estate." In re JMK Constr. Group, Ltd., 441 B.R.

222, 228 (S.D.N.Y. Bankr. 2010).    "Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest." In re Marvel Entertainment Group, 140 F.3d 463, 476 (3d Cir. 1998). "[T]he mandatory provisions of section 327(a) do not allow for waiver" of a conflict of interest. In re Granite Partners, L.P., 219 B.R. 22, 34 (S.D.N.Y. Bankr. 1998).

40.    [T]he district court may within its discretion – pursuant to § 327(a) and consistent with § 327(c) – disqualify an attorney who has a potential conflict of interest [but]. . . may not disqualify an attorney on the appearance of conflict alone." In re Marvel Entertainment Group, 140 F.3d 463, 476 (3d Cir. 1998). Where it is unclear whether a preference, if there is one, presented a conflict, the court should first make a determination whether a preference exists or not. Staiano v. Pillowtex, Inc. (In re Pillowtex, Inc.), 304 F.3d 246, 255 (3d Cir. 2002).

41.    In view of the foregoing, Last Chance Funding supports the Objections filed to the retention of Debtor's counsel.

**WHEREFORE,** Last Chance Funding supports the Objections to the retention of Debtor's counsel and requests that the Court deny the retention of White and Williams LLP in this case, and for such other and further relief as this Court deems just and proper.

Dated: September 16, 2022
         Wantagh, New York

**LAMONICA HERBST & MANISCALCO, LLP**
*Counsel to Creditor The LCF Group, Inc.*
*a/k/a Last Chance Funding Group, Inc.*

By:    *s/Joseph S. Maniscalco*
        Joseph S. Maniscalco, Esq.
        A Member of the Firm
        3305 Jerusalem Avenue, Suite 201
        Wantagh, New York 11793
        (516) 826-6500