**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Fred Stevens
Brendan M. Scott
Kathleen M. Aiello

*Special Litigation Counsel to Plaintiff*
  *Yann Geron, Chapter 7 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
In re                                        :
                                             :    Chapter 7
JAR 259 FOOD CORP.,                          :
                                             :    Case No. 22-40304 (JMM)
                    Debtor.                  :
-----------------------------------------------------------x
YANN GERON, as Chapter 7 Trustee of          :
Jar 259 Food Corp.,                          :
                                             :
                    Plaintiff,               :
                                             :
        -against-                            :    Adv. Pro. No. 24-____(JMM)
                                             :
CLEARFUND SOLUTIONS LLC,                     :
                                             :
                    Defendant.               :
-----------------------------------------------------------x
```

**COMPLAINT OF PLAINTIFF/TRUSTEE AGAINST CLEARFUND SOLUTIONS LLC**

Yann Geron (the "Trustee" or "Plaintiff"), as the chapter 7 trustee of the estate of Jar 259 Food Corp., the above-captioned debtor (the "Debtor"), by and through his undersigned special litigation counsel, Klestadt Winters Jureller Southard & Stevens, LLP, as and for his complaint (the "Complaint") herein against Clearfund Solutions LLC (the "Defendant"), alleges as follows:

1

**PRELIMINARY STATEMENT**

In this adversary proceeding, the Trustee is seeking to avoid and recover numerous transfers of the Debtor to Defendant that are either intentional fraudulent transfers avoidable pursuant to 11 U.S.C. § 548(a)(1)(A), constructive fraudulent transfers avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) and sections 273-275, 278, and 279 of the New York Debtor & Creditor Law, and/or preferential transfers avoidable pursuant to 11 U.S.C. § 547.

**INTRODUCTION**

1. On February 18, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Subchapter V of chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (this "Court") [ECF NO. 1].

2. The Debtor elected to proceed under Subchapter V of Chapter 11. Therefore, no official committee of unsecured creditors was appointed or established in this case.

3. On February 22, 2022, the United States Trustee filed a Notice Appointing Yann Geron as the Subchapter V Trustee of the Debtor's case [ECF No. 3].

4. The Debtor continued to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code from the Petition Date until September 29, 2022, when this Court entered the *Order Granting Motion to Convert Case to Chapter 7* [ECF No. 210].

5. On the Petition Date, the Debtor filed its bankruptcy schedules (the "Schedules") and Statement of Financial Affairs (the "SOFA") [ECF No. 1].

6. On July 19, 2022, the Debtor filed Amended Schedules [ECF No. 120].

7. On August 18, 2022, the Debtor filed an Amended SOFA [ECF No. 136].

8. On October 3, 2022, Yann Geron was appointed as the interim Chapter 7 Trustee of the Debtor's estate [ECF No. 211].

9. On November 3, 2022, the Trustee presided over the meeting of creditors pursuant to section 341(a) of the Bankruptcy Code and became the permanent Trustee herein by virtue of section 704(d) of the Bankruptcy Code.

## BASIS FOR RELIEF

10. This adversary proceeding (the "Adversary Proceeding") is brought to recover damages on the account of: (i) avoidance and recovery of constructive and intentional fraudulent conveyances pursuant to 11 U.S.C. §§ 548 and 550 and sections 273-275, 278, and 279 of the New York Debtor & Creditor Law; (ii) avoidance and recovery of preferential transfers pursuant to 11 U.S.C. §§ 547 and 550; (iii) disallowance of any claims asserted, or that may be asserted, by Defendant pursuant to 11 U.S.C. § 502; and (iv) related relief, including the payment of attorneys' fees and costs.

## JURISDICTION

11. This Adversary Proceeding relates to the bankruptcy case of *In re Jar 259 Food Corp.,* Debtor, Case No. 22-40304 (Bankr. E.D.N.Y. Feb. 18, 2022), which is pending under chapter 7 of the Bankruptcy Code in this Court before the Honorable Jil Mazer-Marino, United States Bankruptcy Judge.

12. This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334, Administrative Order No. 264 titled "In the Matter of The Referral of Matters to the Bankruptcy Judges" of the United States District Court for the Eastern District of New York (Weinstein, C.J.), dated August 28, 1986, and Administrative Order No. 601 of the United States District Court for the Eastern District of New York (Amon, C.J.), dated December 5, 2012.

13.     Plaintiff consents to entry of final orders or judgments by the Court with respect to all claims raised by this Complaint.

14.     Venue of this Adversary Proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409 because it arises in a case under the Bankruptcy Code pending in this district.

## PARTIES

15.     Yann Geron is a member of the panel of private Chapter 7 trustees established by the United States Trustee pursuant to 28 U.S.C. § 586(a)(1). The Trustee is the permanent chapter 7 trustee of the Debtor and its bankruptcy estate and is empowered to bring this Adversary Proceeding. The Trustee maintains an address for the conduct of business at 370 Lexington Avenue, Suite 1101, New York, New York 10017.

16.     As of the Petition Date, the Debtor was a New York corporation incorporated in the State of New York on September 11, 2015. During its operation and prior to the Petition Date, the Debtor maintained its principal place of business at 259-01 Union Turnpike, Floral Park, New York 11004 or 259-11 Union Turnpike, Glen Oaks, New York 11004. The Debtor's registered agent for service of process is listed as NHP Business Management Services, Inc. located at 229 Jericho Turnpike, New Hyde Park, New York 11040.

17.     Defendant is a limited liability company organized under the laws of New York, and maintains a registered office c/o The LLC at 99 Wall Street, 2613, New York, New York 10005.

## FACTS COMMON TO ALL CAUSES OF ACTION

a. **The Debtor Generally**

18.     The Debtor is a New York corporation which was incorporated on or around September 11, 2015.

19. Prior to the Petition Date, the Debtor owned and operated a grocery and food retail store located at 259-11 Union Turnpike, Glen Oaks, New York 11004.

20. Prior to the Petition Date, Amandeep Singh ("Singh") was the Vice President and principal of the Debtor with a 10% ownership interest therein.

21. Prior to the Petition Date, Kuljit Kaur was the President and principal of the Debtor with a 90% ownership interest therein.

22. According to Singh, during the approximately seven years of its operations, the Debtor's store was a "vibrant neighborhood market emphasizing an extensive selection of fresh, naturel [*sic*], and organic products, prepared foods, and hard-to-find specialty and gourmet offerings, along with a full assortment of conventional groceries." *See Rule 1007-4 Declaration of Amandeep Singh* (the "Singh Declaration") [Case No. 22-40304; ECF No. 2 at § 10].

**b. The Debtor's Financial History/Distress**

23. Since its incorporation in 2015, the Debtor had limited assets consisting of: (1) inventory, the value of which the Debtor estimated to be $20,000 as of the Petition Date; (2) certain pre-petition bank accounts which collectively held approximately $25,400 as of the Petition Date; (3) a Lease; and (4) utility deposits, totaling approximately $54,000 as of the Petition Date.

24. Upon information and belief, Singh purchased an ownership interest in the Debtor in 2018.

25. Since on or around October 2015, the Debtor had a Membership Agreement with Key Food Stores Co-operative, Inc. ("Key Food"). In connection with that Membership Agreement, the Debtor executed a promissory note, upon which it later defaulted, as well as a confession of judgment in favor of Key Food. Consequently, Key Food is a secured creditor of the Debtor.

26. According to Singh, "[f]or several years, the Debtor … faced significant financial difficulties due to rising costs of produce and labor. In or around March 2020, Key Food took over the operations of the Debtor's Store. On February 14, 2022, Key Food advised the Debtor that, as of February 19, 2022, it would no longer operate the Debtor's Store." *See* Singh Declaration at ¶ 5.

27. According to Singh, "[p]rior to Key Food's management of the Debtor's store [pre-March 2020] and the COVID-19 pandemic, the Debtor faced significant market pressures. The Debtor was confronted with increasing competition from local, regional and national supermarket grocers as well as convenience stores and other independent and specialty food stores. In recent years, the Debtor also saw increased competition from online retail grocery giants such as Amazon, Walmart and Target." *See* Singh Declaration at ¶ 22.

28. "In addition, the Debtor's workforce was largely unionized which resulted in increased labor costs compared to some of the Debtor's competition. As a result, the Debtor's competitors could offer lower prices to their customers which created increased pricing pressures for the Debtor and reducing overall profits." *See* Singh Declaration at ¶ 23.

29. As the Debtor's financial condition deteriorated rapidly, during the approximately four months between mid-October 2021 and the Petition Date, the Debtor acquired an additional $14.2 million in debt by entering into at least 31 merchant cash advance agreements with at least 24 merchant cash advance entities (the "MCA Companies"), including the MCA Agreement(defined below) in which each of the MCA Companies purported to offer merchant cash advances in exchange for a portion of the Debtor's future receivables.

30. According to Singh, the Debtor "considered the advances provided by the MCA Companies as necessary to continue to operate the Debtor's business." *See* Singh Declaration at ¶ 16.

31. However, in several instances, the Debtor either transferred the proceeds received from the MCA Companies to its affiliates almost immediately upon receipt of such funds, or the proceeds were delivered directly to one or more of the Debtor's affiliates by the MCA Companies. In many instances, the Debtor received no benefit in exchange for entering into agreements with the MCA Companies, and instead merely obligated itself to pay in many instances hundreds of thousands of dollars that the Debtor did not use to support its own operations.

32. The MCA Companies took fixed automatic withdrawals from the Debtor's accounts, which limited the Debtor's ability to operate. *See* Singh Declaration at ¶ 16.

c. **The Merchant Cash Aadvance Agreement and the Transfers**

33. On or about December 14, 2021, the Debtor entered into a Standard Merchant Cash Advance Agreement with Defendant (the "MCA Agreement"), whereby Defendant purported to purchase $450,000 of the Debtor's future receivables (the "Receivables") for $300,000. Pursuant to the terms of the MCA Agreement, Defendant was entitled to make daily withdrawals in the 2 years prior to the Petition Date in the amount of $8,181.82 from one of the Debtor's bank accounts (the "2 Year Transfers"), which the Debtor and Defendant alleged at the time the MCA Agreement was executed to be equal to 22% of the Debtor's daily aggregate cash receipts (the "Specified Percentage").

34. A copy of the MCA Agreement is annexed hereto as Exhibit "1".

35. Upon information and belief, the Debtor knew at all relevant times that the purchase price set forth in the MCA Agreement was less than the fair market value of the Debtor's Receivables.

36. The MCA Agreement included a provision allowing Defendant to investigate the Debtor's financial condition, which, among other things, required the Debtor to provide Defendant with any authorizations, bank statement, financial statement, and tax returns which Defendant deemed necessary in its sole discretion.

37. The MCA Agreement included a provision whereby the Debtor represented that it held unencumbered title to the Receivables, and that the Receivables were free and clear of any liabilities, liens or claims.

38. The MCA Agreement included a provision whereby the Debtor represented that it would not enter into any arrangement, agreement or commitment related to the Receivables whether in the form of a purchase, a loan against, collateral against, or the sale or purchase of credits against Receivables without Defendant's prior written consent.

39. The MCA Agreement also contained a provision that purported to allow the Debtor to request a reconciliation of its accounts in the event the Daily Withdrawal exceeded the Specified Percentage of the Debtor's actual receipts that Defendant was entitled to receive.

40. Defendant received 2 Year Transfers totaling $474,545.46, in the amounts and on the dates identified in the annexed Exhibit "2".

41. Pursuant to the terms of the MCA Agreement, Defendant was entitled to receive a maximum daily transfer equal to 22% of the Debtor's actual receipts on the date each of the 2 Year Transfers was made by the Debtor.

42. Upon information and belief, the 2 Year Transfers exceeded the Specified Percentage of the Debtor's actual receipts on the date such 2 Year Transfers were made.

43. Under a true reconciliation provision, if a merchant pays more through its fixed daily payment than it actually received in receivables on that day, the merchant is entitled to seek the repayment of any excess money paid. The size of the daily payment made by the Debtor should have been tied to the amount of the Debtor's actual daily receipts.

44. For example, if a company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA counterparty would be entitled to keep is $25,000. Thus, if the merchant paid $40,000 through its daily payments, then the merchant would be entitled to a refund of $15,000 under the reconciliation provision.

45. During the period from March 2021 to February 2022, the Debtor purported to sell approximately $14 million of its future receivables to numerous entities by way of various merchant cash advance agreements, and the Debtor obligated itself to make daily transfers to various counter parties to merchant cash advance agreements, including the MCA Agreement, in the aggregate amount of more than $300,000, an amount which exceeded the Debtor's historic daily cash receipts by tens of thousands of dollars.

46. The Debtor's tax returns for the year 2020 demonstrate that the Debtor's average daily sales were approximately $32,000. As such, during the period from October 1, 2021 through the Petition Date, the Debtor obligated itself to make aggregate daily payments on account of various MCA Companies that exceeded the Debtor's historic average daily cash receipts by more than nine times.

47. During the period from March 2021 to February 2022, the Debtor entered into various merchant cash advance agreements pursuant to which the Debtor agreed to allow the MCA Companies to such agreements to make daily withdrawals in an aggregate amount that the Debtor knew was significantly more than Debtor's historic daily cash receipts.

48. Upon information and belief, the Debtor knew it had made false statements in the MCA Agreement regarding the amount of its historic daily cash receipts, and knew that the Specified Percentage was not based upon an accurate estimate of the Debtor's historic daily cash receipts.

49. Upon information and belief, the Debtor knew at all relevant times that its operations would not, and could not possibly, provide sufficient cash to pay all of the Debtor's daily aggregate obligations under the MCA Agreement and the various other merchant cash advance agreements that the Debtor had entered into.

50. Upon information and belief, the Debtor was aware that the amount of the 2 Year Transfers exceeded 22% of the Debtor's actual historic daily receipts, yet it did not seek reconciliation of the 2 Year Transfers because the Debtor intended to conceal its dire financial condition to avoid Defendant calling a default under the MCA Agreement, so that the Debtor could continue to seek additional funds from other potential lenders.

51. The Debtor engaged in a Ponzi-like scheme whereby it used the proceeds obtained from new merchant cash advance agreements to repay obligations owed under older merchant cash advance agreements.

52. Defendant was aware or should have been aware that the amount of each of the 2 Year Transfers exceeded 22% of the Debtor's actual receipts on the date of such 2 Year Transfers

because Defendant had access to the Debtor's books and records but willfully chose to put its head in the sand and ignore numerous red flags regarding the Debtor's operations.

53. Despite the Debtor's representations in the MCA Agreement that the Debtor was selling the receivables free and clear of any encumbrances, liens, and claims, Defendant knew or should have known that various creditors, including among others, Key Food, NewBank, the U.S. Small Business Administration, Last Chance Funding Inc., The LCF Group, Inc. and other entities that had entered into loan agreements or merchant cash advance agreements with the Debtor, had filed UCC Financing Statements prior to the date on which the MCA Agreement was executed by the Debtor wherein such entities alleged to hold liens on some or all of the Debtor's Receivables, and the proceeds thereof.

54. Despite the Debtor's representations in the MCA Agreement that the Debtor would not enter into any other arrangement, agreement or commitment relating to the Receivables without Defendant's prior written consent, Defendant knew or should have known that various creditors, including other entities that had entered into merchant cash advance agreements with the Debtor, had filed UCC Financing Statements after the date on which the MCA Agreement were executed by the Debtor wherein such entities alleged to hold liens on some or all of the Debtor's Receivables, and the proceeds thereof.

55. A reasonable party on inquiry notice of the Debtor's misrepresentations would have investigated the facts in order to determine whether the Debtor had breached its representations and warranties regarding the Receivables.

56. A reasonable party on inquiry notice of the Debtor's misrepresentations would have investigated the facts to determine whether another party had superior rights to Defendant with regard to the Receivables.

57. A reasonable party on inquiry notice of the Debtor's misrepresentations would have investigated the facts to determine whether the Debtor had misrepresented any other facts in the MCA Agreement, including whether the Specified Percentage was based upon a good faith or fair estimate of the Debtor's daily cash receipts.

58. Upon information and belief, Defendant did not engage in any investigation, and instead continued to accept the 2 Year Transfers without asking any questions despite numerous red flags indicating that the Debtor may have made numerous misrepresentations in the MCA Agreement.

59. Although the Debtor knew or should have known that the 2 Year Transfers exceeded the Specified Percentage of the Debtor's receipts that Defendant was entitled to draw on a daily basis pursuant to the terms of the MCA Agreement, the Debtor continued to allow the 2 Year Transfers, which it was not obligated to make, in an effort to conceal the Debtor's dire financial condition and to allow the Debtor to continue its scheme to obtain new funds from additional lenders.

60. Although the Debtor's Receivables and the proceeds thereof were at all relevant times subject to senior liens, the Debtor intentionally transferred the proceeds of such Receivables to Defendant as part of its fraudulent scheme in an effort to conceal the Debtor's dire financial condition and to allow the Debtor to continue its scheme to obtain new funds from additional lenders.

### d. Alternatively, the Transaction Contemplated in the MCA Agreement was a Disguised Loan.

61. The transaction contemplated in the MCA Agreement was a repayable loan.

62. Among other indications that the transaction contemplated by the MCA Agreement was a loan are the following:

a. The daily payments required by the MCA Agreement were fixed and the so-called reconciliation provision was illusory. Just like any other loan, the purchased amount was to be repaid within a specified time.

b. The default and remedy provisions purported to hold the Debtor directly liable for repayment of the purchased amount. The MCA Agreement sought to obligate the Debtor to ensure sufficient funds were maintained in a designated account to make the daily payments and, after just a few instances of insufficient funds being maintained in the account, the Debtor would be in default and, upon default, the outstanding balance of the purchased amount would become immediately due and owing.

c. While the MCA Agreement purported to "assign" all the Debtor's future account receivables to Defendant until the purchased amount was paid, the Debtor retained all the *indicia* and benefits of ownership of the account receivables, including the right to collect, possess and use the proceeds thereof. Rather than purchasing receivables, Defendant merely acquired a security interest in the Debtor's receivables to secure payment of the purchased amount.

d. Unlike true receivable purchase transactions, the MCA Agreement was underwritten based upon an assessment of the Debtor's creditworthiness; not the creditworthiness of any entity which owed moneys to the Debtor. Defendant was not even permitted to contact any of its account debtors until there was an alleged default under the MCA Agreement.

e. The purchased amount was not calculated based upon the fair market value of the Debtor's future receivables, but rather was unilaterally dictated by Defendant based upon the interest rate it wanted to be paid. Upon information and belief, as part of the underwriting process, Defendant did not request any information concerning the Debtor's future account receivables upon which to make a fair market determination of their value.

f. The amount of the daily payments to Defendant was determined based upon when Defendant wanted to be paid, not upon any good faith estimate of the Debtor's future account receivables.

g. Defendant assumed no risk of loss in the event of a downturn in the Debtor's business because the failure to maintain sufficient funds in the Debtor's account, even if due to decreased revenue, constituted a default under the MCA Agreement.

h. Defendant required the Debtor to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the Debtor would continue to operate and generate receivables and a breach of such obligations, representations and warranties

    constituted a default, which fully protected Defendant from any risk of loss resulting from the Debtor's failure to generate and collect receivables.

    i. Defendant required that the Debtor grant it a security interest in its receivables and other intangibles and that the individual owners personally guarantee the performance of the representations, warranties and covenants, which Defendant knew or should have known were breached from the moment the MCA Agreement were signed.

63. New York law looks primarily to the intent of the parties in determining whether a transaction is a loan. Here, the intent that the subject transaction was a loan can be discerned from internal negotiations, practices, and underwriting practices of Defendant, which determine the payback based on the number of days in which Defendant wants to be paid back. The number of days for payback has no relation to the timing of the percentage of receivables that Defendant was purporting to purchase.

  **e. Transfers to Defendant**

64. In the two years preceding the Petition Date, the Debtor made the 2 Year Transfers to Defendant in the aggregate amount of not less than $474,545.46, as set forth in the annexed Exhibit "2".

65. In the ninety (90) days preceding the Petition Date, the Debtor made transfers to Defendant in the aggregate amount of not less than $474,545.46, as set forth in the annexed Exhibit "2" (collectively, the "90 Day Transfers").

66. On or about December 29, 2021, Defendant received a transfer in the amount of $383,545.44 directly from an entity doing business as Cobalt Funding (the "Cobalt Transfer"), which amount was paid to Defendant by Cobalt Funding at Debtor's request to pay the alleged obligations owed under the MCA Agreement. The Debtor obtained an interest in the funds that comprised the Cobalt Transfer, by entering into a certain Standard Merchant Cash Advance Agreement (the "Cobalt MCA Agreement") with Cobalt Funding, whereby the Debtor purported

to sell $1,140,000 of its future receivables for $760,000. Rather than paying the full purchase price under the Cobalt MCA Agreement to the Debtor, $383,545.44 of that purchase price was paid directly to Defendant by Cobalt Funding. Cobalt Funding filed a proof of claim in the Debtor's case alleging that it is owed $1,426,349.38 on account of a judgment obtained against the Debtor arising from the Cobalt MCA Agreement.

67. The Cobalt Transfer is included in the aggregate amount of the 2 Year Transfers and the 90 Day Transfers.

### FIRST CAUSE OF ACTION
**(Avoidance of Intentional Fraudulent Transfers - 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551)**

68. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein at length.

69. The 2 Year Transfers were made by the Debtor with the actual intent to hinder, delay, or defraud the creditors of the Debtor.

70. The Debtor held an interest in the funds that comprised the 2 Year Transfers.

71. Defendant cannot satisfy its burden of establishing that it took the 2 Year Transfers for value and in good faith.

72. Therefore, Plaintiff is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(A), 550(a), and 551: (a) avoiding and preserving the 2 Year Transfers, (b) directing that the 2 Year Transfers be set aside, and (c) recovering the 2 Year Transfers from the Defendant for the benefit of the Debtor's estate.

## SECOND CAUSE OF ACTION
**(Avoidance of Constructive Fraudulent Transfers  11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551)**

73. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein at length.

74. The Debtor (a) was insolvent on the dates that the 2 Year Transfers were made or became insolvent as a result of the 2 Year Transfers, and/or (b) was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with the Debtor's after the 2 Year Transfers were effectuated constituted unreasonably small capital, and/or (c) at the time of the 2 Year Transfers, intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

75. The Debtor held an interest in the funds that comprised the 2 Year Transfers.

76. The Debtor received less than a reasonably equivalent value in exchange for the 2 Year Transfers.

77. To the extent Defendant is not an initial transferee of the 2 Year Transfers, it is an immediate or mediate transferee of the initial transferee(s) of the 2 Year Transfers, and did not take the 2 Year Transfers for value or in good faith or without knowledge of the voidability of the 2 Year Transfers.

78. Therefore, Plaintiff is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(B), 550(a) and 551: (a) avoiding and preserving the 2 Year Transfers, (b) directing that the 2 Year Transfers be set aside, and (c) recovering the 2 Year Transfers from Defendant for the benefit of the Debtor's estate.

## THIRD CAUSE OF ACTION
### (Avoidance of Fraudulent Transfers - New York Law, DCL §§ 273-275, 278, and 279)

79. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein at length.

80. Each of the 2 Year Transfers constituted a transfer of an interest of the Debtor in property.

81. At all relevant times there have been one or more creditors who have held and still hold matured or un-matured unsecured claims against the Debtor that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

82. The Debtor did not receive fair consideration for the 2 Year Transfers.

83. The Debtor was insolvent at the time the 2 Year Transfers occurred, or, in the alternative, the Debtor became insolvent as a result of the 2 Year Transfers.

84. At the time of the 2 Year Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the 2 Year Transfers was an unreasonably small capital.

85. At the time of the 2 Year Transfers, the Debtor intended or believe that it would incur debts beyond its ability to pay as they mature.

86. At the time of the 2 Year Transfers, Defendant was aware or should have been aware that the Debtor was insolvent and did not have the ability to pay its debts as those debts became due. Thus, Defendant received the 2 Year Transfers without good faith and with the knowledge of their avoidability.

87. Therefore, Plaintiff is entitled to a judgment pursuant to sections 273-275, 278, and 279 of the New York Debtor & Creditor Laws and section 544 and 550 of the Bankruptcy Code: (a) avoiding the 2 Year Transfers, (b) directing that the 2 Year Transfers be set aside, and (c) recovering the 2 Year Transfers from Defendant for the benefit of the Debtor's estate.

### FOURTH CAUSE OF ACTION
**(Avoidance of Preferential Transfers – 11 U.S.C. § 547)**

88. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein at length.

89. Within the ninety days prior to the Petition Date, Defendant received the 90 Day Transfers.

90. The Transfers were made to or for the benefit of Defendant.

91. The Debtor held an interest in the funds that comprised the 90 Day Transfers.

92. Upon information and belief, Defendant was a creditor of the Debtor. Defendant has filed a proof of claim in the Debtor's Chapter 7 Case alleging that it is owed $476,530.56 under the terms of the MCA Agreement.

93. The 90 Day Transfers were made while the Debtor was insolvent.

94. The 90 Day Transfers were for or on account of antecedent debts owed by the Debtor to Defendant before the 90 Day Transfers were made.

95. The 90 Day Transfers enabled Defendant to receive more than it would have received if (a) the Debtor's case was filed under Chapter 7 of the Bankruptcy Code, (b) the 90 Day Transfers had not been made, and (c) Defendant received payment of such debts to the extent provided by the provisions of the Bankruptcy Code.

96. Therefore, the Plaintiff is entitled to a judgment pursuant to pursuant to Bankruptcy Code §§ 547, 550(a) and 551: (a) avoiding the 90 Day Transfers, (b) directing that the 90 Day Transfers be set aside, and (c) recovering the 90 Day Transfers from Defendant for the benefit of the Debtor's estate.

## FIFTH CAUSE OF ACTION
### (Disallowance of Defendants Claims Pursuant to 11 U.S.C. § 502(d))

97. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein at length.

98. Defendant is an entity from which property is recoverable under section 550 of the Bankruptcy Code or are transferees of a transfer or obligation avoidable under section 548 of the Bankruptcy Code.

99. Defendant has not paid the amount or turned over any property transferred for which Defendant is liable under section 550 of the Bankruptcy Code.

100. Any filed claims held by Defendant must be disallowed until Defendant pays in full or returns the property for which they are liable under section 550 of the Bankruptcy Code.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff demands judgment in its favor and against Defendant as follows:

a) On Count One, a judgment against Defendant pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550 avoiding the 2 Year Transfers, directing the 2 Year Transfers be set aside, and directing Defendant to return to the Debtor's estate the amount of the 2 Year Transfers, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees;

b) On Count Two, a judgment against Defendant pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550 avoiding the 2 Year Transfers, directing the 2 Year Transfers be set aside, and directing Defendant to return to the Debtor's estate the amount of the 2 Year Transfers, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees.

c) On Count Three, a judgment against Defendant pursuant to New York DCL §§ 276, 276-a, 278, 279 and 11 U.S.C. § 544 avoiding the 2 Year Transfers, directing the 2 Year Transfers be set aside, and directing Defendant to return to the Debtor's estate the amount of the 2 Year Transfers, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees.

d) On Count Four, a judgment against Defendant pursuant to 11 U.S.C. §§ 547 and 550 avoiding the 90 Day Transfers, directing the 90 Day Transfers be set aside, and directing Defendant to return to the Debtor's estate the amount of the 90 Day Transfers, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees;

e) On Count Five, a judgment against Defendant pursuant to 11 U.S.C. § 502 disallowing any claims held or filed by the Defendant against the Debtor or the Debtor's chapter 7 estate until the Defendant pays the full amount of any judgment granted in Plaintiff's favor; and

f) Such other and further relief as this Court may deem just and proper.

Dated:   New York, New York
         February 15, 2024

**KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**

By:   */s/ Brendan M. Scott*

Fred Stevens
Brendan M. Scott
Kathleen M. Aiello
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: fstevens@klestadt.com
       bscott@klestadt.com
       kaiello@klestadt.com

*Special Litigation Counsel to Plaintiff Yann Geron, Chapter 7 Trustee*